UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NO.: 6:02-cv-1437-Orl-22DAB

ROBERT P. HATMAKER,

    Plaintiff,

vs.                                 **DISPOSITIVE MOTION**

LIBERTY MUTUAL FIRE INSURANCE
COMPANY,

    Defendant.
_____/

## LIBERTY MUTUAL'S MOTION TO DISMISS COMPLAINT WITH PREJUDICE FOR FRAUD ON THE COURT AND INCORPORATED MEMORANDUM OF LAW

Defendant, Liberty Mutual Fire Insurance Company ("Liberty Mutual"), by and through its undersigned counsel and pursuant to Rule 41(b) of the Federal Rules of Civil Procedure and/or the equitable sanction authority of this Court, hereby moves this Court to dismiss Plaintiff's complaint as a result of Plaintiff's fraud on the court. On four separate occasions prior to the institution of this action, including in testimony to the State Attorney in a criminal prosecution of Liberty Mutual insured, John Harley Cox, Plaintiff gave sworn testimony that, at the time of an altercation between Plaintiff and Mr. Cox, Mr. Cox "jumped on top of me", "kicked me" and "absolutely beat the hell out of me". Nevertheless, in this civil litigation for insurance coverage under Mr. Cox's homeowner's policy, Plaintiff recanted that sworn testimony and now has testified that he had no memory of being attacked during

{M2026323;1}

1

the altercation, never knew what actually happened during the altercation, and that each of his prior sworn statements, including the ones used in the criminal prosecution against Mr. Cox, were based on opinion and/or supposition, not personal knowledge, recollection, or fact. Given that the Liberty Mutual policy at issue contains an exclusion for intentional acts (which would bar coverage if Mr. Cox attacked Plaintiff), Plaintiff's decision under oath in this case to recant his four prior sworn statements is nothing other than blatant gamesmanship and an intolerable manipulation of the legal system. As a result of such abuse, this Court should dismiss plaintiff's complaint in its entirety with prejudice.

## BACKGROUND

### A. The Testimony Prior to the Instant Lawsuit

This case arises out of a dispute between Liberty Mutual insured, John Harley Cox, and his neighbor, Robert Hatmaker (the Plaintiff). On or about October 12, 1998, Mr. Cox and Plaintiff were involved in an altercation resulting from Mr. Cox's displeasure that Plaintiff was photographing him.

Mr. Cox was arrested for felony battery arising from this incident. During the pendency of the criminal case against Mr. Cox, on December 17, 1998, Plaintiff gave a sworn Statement to the Orange County Sheriff's Office. A copy of that Statement is attached as Exhibit A. In his Statement, plaintiff describes the physical altercation as follows:

> ...I saw him [Cox] coming under the fence. I saw him put his hand in his pocket – when he bent over. I thought he had a gun in his pocket. Both of them [Cox and Gary Smith] came under the fence. I stopped and took a picture of them about 15-20 feet away. I started running south on the Mormon fence about 250 feet. I decided I better go back under the fence onto my property. They caught me and threw me into the ditch.

{M2026323;1}

> Approximately 15-20 feet west of Morman fence into 8-10 inches of water and mud and **jumped on top of me and started beating me on the side of my head.** I could not see – since my glasses had fell off. They had my head in the ditch in mud and water. **Harley Cox was still beating on me and kicking me.** Gary Smith was trying to get the camera out of my hands. I came to after they had knocked me out.

Exhibit A at 2-3.

As part of the discovery in the criminal case, on June 21, 1999, Plaintiff gave a deposition. A copy of the deposition is attached hereto as Exhibit B. In numerous instances during that deposition, Plaintiff recounted a similar version of events to the Assistant State Attorney:

> A. ...When they grabbed me, I lost my glasses... So when they grabbed me and they throwed me over there, my glasses come off. I never did get my glasses back. Throwed me over into the ditch. I couldn't see. It was muddy in the ditch. It was full of water. And that's when Harley [Cox] and Gary [Smith] jumped on me, then. Then like I say –
>
> Q. What did they do to you?
>
> A. Beat the hell out of me.
>
> Q. Who did what? Do you know what Harley did, sir, as opposed –
>
> A. Listen, when someone is sitting on top of you and you're standing there trying to keep them from beating your head in, you're laying in water flat on your face and they're beating the hell out of me – that's what they did.
>
> Q. Do you know what Harley did as opposed to what Gary did? Can you say who it was that was hitting you? Can you say for sure?
>
> A. I could say that Harley Cox was sitting there on the left side of me like this, and I'm laying stretched out like this with my hand out with the camera in it. They was trying to get the camera. Gary was trying to get the camera. See, I had took some pictures. They was some more pictures in this camera besides the one I took. (indicating)

Q. I know. Do you know whether or not Harley Cox ever hit you?

A. Harley? Yes. Harley Cox beat the hell -- I told Harley Cox, I said "You'll pay for this." He said, "$200, it will be worth it."

Q. How do you know that Gary Smith wasn't the one that was hitting you?

A. Well, Gary Smith – I know Gary Smith kicked me. I know that. I could see his feet up there when I had the thing up there.

Q. You were face down in the water, right?

A. I was down, laying down in the water. It wasn't that deep. I wasn't about to drown. I wasn't about to let myself drown.

Q. Did Harley Cox ever strike you when you were looking at him face-to-face?

A. I looked at him when I said that to him.

Q. Sir. Were you ever standing up looking at him face-to-face?

A. He – never. No. No, face-to-face. He caught me. And when I started under the fence, throwed me back and jumped on top of me.

Exhibit B at 27-31. Mr. Hatmaker continued:

Q. Did they beat the hell out of you?

A. I mean absolutely beat the hell out of me.

Q. Mr. Hatmaker—

A. I'm not exaggerating.

Q. – did they hit you in the face?

A. **Hit me in the face.**

Q. Several times?

A. **Bunch of times. All over. My eyes blacked...**

> Q. So it wasn't Harley Cox that did this to your shoulders? That's what you're telling me?
>
> A. I don't see how it could have been Harley because **Harley was over here beating me in the side of the head...**

Id. at 34, 36.

On November 9, 1999, John Harley Cox pled nolo contedere to misdemeanor battery. See Exhibit C. The court found him guilty and he was sentenced to one day in jail, credit for time served, one year's probation, anger management class and payment of restitution to Plaintiff.

Following the criminal case, Plaintiff sued Mr. Cox and Mr. Smith in state civil court for claims arising from the altercation, including battery. As part of that litigation, on June 6, 2001, Plaintiff submitted sworn interrogatory responses as follows:

> 8. Describe in detail how the incident described in the complaint happened, including all actions taken by you to prevent the incident.
>
> ... They caught me and threw me into the ditch approximately 15-20 feet west of the Mormon fence into 8-10 inches of water and mud and jumped on top of me and started beating me on the side of my head. They had my head in the ditch in mud and water. Harley Cox was still beating on me and kicking me. Gary Smith was trying to get the camera out of my hands. They knocked me out.

Exhibit D at Interrogatory 8.

On June 13, 2001, as part of the discovery in the tort suit Hatmaker brought against Cox and Gary Smith, Plaintiff again testified by deposition as follows:

> Q. ...Did they catch you?

{M2026323;1}

> A. Yes, they caught me down here... Well, I was going to go under the fence; but they caught me before I went under the fence, I guess, and hit me. Only thing that I remember, **Cox is on top of me beating the hell out of me when I come to....**
>
> Q. Do you know which one knocked you down?
>
> A. I'm sure it was Harley Cox.
>
> Q. Okay. And then was Mr. Cox punching you on the ground?
>
> A. Yeah.
>
> Q. Was Mr. Smith?
>
> A. Knocked me out. I guess when I come to, Cox is on top of me, beating the hell out of me...

Exhibit E at 31, 33.

> A. I was in a ditch. I was laying on my face. **Somebody was beating the hell out of me. And I wasn't going to turn around and look them straight in the eye, and somebody beating the hell out of me.** I was trying to stay away from anything that's going to hurt me.

Id. at 36 (emphasis added).

> Q. How many times were you struck with a fist?
>
> A. I am not positive how many times I was struck.
>
> Q. Give me an estimate....
>
> A. I'm not positive.
>
> Q. Three times?
>
> A. More than that, I know.
>
> Q. Ten times?
>
> A. I'm not exactly sure.

{M2026323;1}

6

    Q.    Less than ten?

    A.    Not sure.

Id. at 80-81.

    Q.    How did they hurt your shoulder then?

    A.    I'm not sure.

    Q.    How did Harley Cox hurt your shoulder?

    A.    I'm not sure. **Probably when he hit me, when he was running me, or knocked me down.**

Id. at 81-82. At no time, in any of the sworn statements, did Mr. Hatmaker testify that he did not know what happened during the altercation, that he was unsure if he was punched or that he was speculating or guessing as to what really happened that day.[1]

Following the deposition of Plaintiff in the tort case, on June 25, 2001, the parties entered into a settlement agreement in which Plaintiff agreed to hold Cox harmless in exchange for an assignment of Cox's rights to coverage under Cox's homeowner's insurance policy with Liberty Mutual. A copy of that settlement agreement is attached hereto as Exhibit G. This action followed.

    B.    The Instant Lawsuit

Plaintiff has sued Liberty Mutual for breach of contract, alleging that Mr. Cox's homeowner's policy provides coverage for the altercation at issue. The Liberty Mutual policy

---

[1] In addition, in the instant case, Plaintiff's wife confirmed Plaintiff's initial testimony and statements that Cox had beaten him up:
Q: What I want to know is, during these conversations that you and your husband and the sheriff were having together, what did your husband say about what had happened to him?
A: He said that Mr. Cox and Mr. Smith had beat him up.
See Deposition of Joan Hatmaker at 23, attached hereto as Exhibit F.
{M2026323;1}

7

provides that in certain circumstances, Mr. Cox will be covered for certain liabilities he incurs. The policy, however, provides for the following exclusion to coverage: "**Coverage E – Personal Liability and Coverage F – Medical Payments to Others** do not apply to 'bodily injury' or 'property damage': a. which is expected or intended by the 'insured'" . . . (emphasis in original). This exclusion is commonly referred to as an "intentional act exclusion."

Under the terms of the Liberty Mutual policy, if Mr. Cox's actions trigger the intentional act exclusion, there is no coverage for the claim. See, e.g., Cabezas ex rel. Ferrer v. Florida Farm Bureau Cas. Ins. Co., 830 So. 2d 156 (Fla. 4th DCA 2002); State Farm Fire & Cas. Co. v. Caldwell, 630 So. 2d 668 (Fla. 4th DCA 1994); State Auto Mut. Ins. Co. v. Scroggins, 529 So. 2d 1194 (Fla. 5th DCA 1988). Therefore, Florida case law presents Plaintiff with a dilemma: while an intentional battery by Mr. Cox upon Plaintiff is essential to the criminal count against Mr. Cox and bolsters Plaintiff's civil claims against Mr. Cox, the very same battery would cause a denial of coverage in the instant action and prevent Plaintiff from recovering any benefits under Mr. Cox's insurance policy. As explained below, Plaintiff's attempted solution to his dilemma is to tailor his testimony in this case in an attempt to avoid the intentional act exclusion that bars the coverage he seeks. In doing so, however, Plaintiff has committed a fraud upon this Court.

C. **Plaintiff's Testimony in the Instant Suit**

Notwithstanding Plaintiff's steadfast insistence during the pendency of the criminal case and the underlying tort case that Mr. Cox attacked him, Plaintiff's testimony in this case

{M2026323;1}

8

has now dramatically changed. Rather than continuing to testify that Cox attacked him, Plaintiff now recants his prior statements, claiming instead that he never had any personal knowledge of the facts he swore supported his battery allegations, and that his prior testimony was based on his supposition and opinion as to what must have happened. Plaintiff testified as follows:

> Q. Do you remember being thrown to the ground?
>
> A. I don't think that I was throwed to the ground. I think I was – from behind I'm not sure what happened, but I don't see how you would word it throwed to the ground when you're running as fast as you can go.

Exhibit H at 39-40. He continued:

> Q. Do you recall being struck, punched?
>
> A. Huh?
>
> Q. Do you recall being struck or punched?
>
> A. Struck?
>
> Q. U-huh.
>
> A. No.
>
> Q. What about punched?
>
> A. No. I don't know what happened. I don't know what happened.
>
> Q. Did you ever tell anybody that you had been struck or punched?
>
> A. I mean, I told – I told my wife that when she come home from work and I told her, the deputy sheriff.
>
> Q. That you had been struck or punched?

> A. Well, I told him that they jumped on me back there, you know, but I don't, you know, I don't know what happened back there because I can't – I can't tell you, you know, exactly what happened exactly back there happened, no way knowing what happened because, like I said, I couldn't see, I didn't have no glasses, mud and dirt all around, all over my face and everything.
>
> Q. At no time have you ever known what happened, is that your position today?
>
> ...
>
> A. If I do know what happened to me back there now?
>
> Q. Or did you ever know?
>
> ...
>
> A. No. All I know is that Gary Smith and Harley Cox was back there, and I don't – I still don't know where because, like I said, I couldn't see, didn't have my glasses. I couldn't even -- I couldn't find my way hardly back. I didn't have glasses when I got back to the house.
>
> Q. Did you ever tell the State Attorney's Office that Mr. Cox beat the hell out of you?
>
> A. Oh, I'm sure I said that they beat me up, you know.
>
> Q. In fact, you said that under oath, didn't you?
>
> A. Yeah, probably.
>
> Q. Well, did they beat you up?
>
> A. **I'm not sure what they did. But I didn't see – I'm just telling you what I think they done, that's it, you know. I'm just assuming.**
>
> Q. **So you told the State Attorney's Office that they beat you up without knowing that they hit you?**
>
> A. **Well, I'm sure they hit me, I'm sure they hit me, but I – I – I don't – I probably told them that they beat me up, you know, but I didn't see them beat me up.**

Exhibit H at 39 – 42. He further stated that:

{M2026323;1}

10

> Q. Okay. Now, sir, you testified a moment ago that you have no recollection of anybody catching up to you while you were running, correct?
>
> A. No. I don't know what happened. I really honestly don't know because I was running and I don't know, like I said, I couldn't figure out, you know, what had happened to me.

Id. at 43. He continued:

> Q. You don't remember being touched by Mr. Cox?
>
> ...
>
> A. **I don't remember being touched by nobody, you know.**
>
> Q. You don't remember being thrown to the ground, correct?
>
> ...
>
> A. If I knew, I would tell you.
>
> Q. Okay.
>
> A. I would be honest with you and tell you if I knew what happened, I would tell you. Honestly, I do not know except I know that I was running from them and I know I wound up in the ditch. And if you asked me who hit me, what happened, I have no idea.
>
> Q. And then what about when you testified in 1999 that they beat the hell out of you, did you know that then?
>
> ...
>
> A. No, I didn't know. Only thing I know my vocabulary is just if somebody jumps on me, you know, I never heard the word battered before, you know ... I have no -- no way of knowing you know, you know, what happened to me. And like I said, I just feel like they beat me up but I can't say that, you know.
>
> Q. But you said it before, correct?
>
> A. **Yeah, but I guess you know, but I don't know if they did.**

{M2026323;1}

...

Id. at 48-49.

> Q. And yet on several occasions you told the state attorney that Harley Cox beat the hell out of you, correct?
>
> ...
>
> A. **I was just trying to express my opinion of what I think happened.**
>
> Q. Did you tell the state attorney that what you were testifying to was opinion and speculation?
>
> A. I told what now?
>
> ...
>
> A. I don't remember what I told him, you know. I just – is what I felt, you know. I just – is what I felt, you know that happened to me, **I don't know what happened to me. I'll be honest with you.**

Id. at 52-53.

This Court has the authority to dismiss Plaintiff's coverage claim based on the blatant manipulation in Plaintiff's testimony to better conform to the elements of his current cause of action. This Court need not tolerate such an obvious manipulation of the legal system. It should dismiss Plaintiff's complaint.

## MEMORANDUM OF LAW

I. **THE PLAINTIFF'S ATTEMPT TO MANIPULATE THE JUDICIAL SYSTEM IS CAUSE FOR DISMISSAL WITH PREJUDICE UNDER THIS COURT'S PRECEDENCE**

Federal courts have the inherent power to regulate litigation and to sanction litigants for abusive practices. See Vargas v. Peltz, 901 F. Supp. 1572, 1579 (S.D. Fla. 1995); Link v.

{M2026323;1}

12

Wabash Railroad Co., 370 U.S. 626, 632 (1962); see also Malautea v. Suzuki Motor Co., 987 F.2d 1536, 1545 (11th Cir. 1993) (recognizing that federal courts have the power to impose reasonable and appropriate sanctions on those appearing before them). Those inherent powers include the authority to dismiss under Rule 41(b) the claims of a litigant who commits fraud on the court. See McDowell v. Seaboard Farms of Athens, Inc., 1996 WL 684140 (M.D. Fla. 1996); Vargas, 901 F. Supp. 1572; Pope v. Federal Express Corp., 138 F.R.D. 675, 683 (W.D. Mo. 1990); see also Aoude v. Mobil Oil Corp., 892 F.2d 1115, 1118 (1st Cir. 1989) (noting that a "federal district court possesses the inherent power to deny the court's processes to one who defiles the judicial system by committing fraud on the court").[2]

As a general rule, a party is deemed to have perpetrated a fraud on the court when it can be established that a party has attempted to interfere with the judicial system's ability to impartially adjudicate a matter. See Aoude, 892 F.2d at 1118; McDowell, 1996 WL 684140 at *2 (fraud on the court exists where scheme results in interference with the judicial system's ability to impartially adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense). In McDowell, this Court made it clear that attempts to manipulate the judicial system's ability to impartially adjudicate a matter was a cause for dismissal. The court dismissed with prejudice the Title VII claim of a pro se plaintiff based on its finding that he had lied repeatedly in his

---

[2] Judicial estoppel, with its own independent elements, has also been utilized to protect the integrity of the judicial system where it is challenged. See New Hampshire v. Maine, 532 U.S. 742, 749-50 (2001) (explaining that the doctrine of judicial estoppel protects the integrity of the judicial process by precluding parties from deliberately changing positions according to the exigencies of the moment). As the Eleventh Circuit recently explained, parties cannot be allowed to play "fast and loose with the courts" to suit their legal objectives. Burnes v. Pemco Aeroplex, Inc., 291 F.3d 1282 (11th Cir. 2002) (internal citations omitted). Therefore, courts have routinely sanctioned plaintiffs where fraud and/or perjury have occurred.

{M2026323;1}

13

depositions and during an evidentiary hearing. See McDowell, 1996 WL 684140. The plaintiff had initially submitted to the defendant a copy of a diary in which he had allegedly made entries about the defendant's discriminatory practices. During his initial deposition, the plaintiff referred to and answered questions about the document as if it were his diary. However, after being questioned about the mismatched dates in the purported diary, the plaintiff changed his story and in his subsequent court filings alleged that the document was not a diary but a notebook containing highlights of the case. After considering the plaintiff's inconsistent statements, the court concluded that the plaintiff had lied under oath and fabricated the document at issue to bolster his claims of racial discrimination, and as a result, the court dismissed the complaint for fraud on the court. Id. Similarly, in O'Vahey v. Miller, 644 So. 2d 550, 551 (Fla. 3d DCA 1994), the court affirmed the dismissal of a complaint for fraud on the court because the plaintiff repeatedly lied under oath about his personal background and education. See also Metropolitan Dade County v. Martinsen, 736 So. 2d 794 (Fla. 3d DCA 1999) (ordering dismissal of a claim because the plaintiff had lied in her deposition and response to interrogatories about her medical history); Leo's Gulf Liquors v. Lakhani, 802 So. 2d 337 (Fla. 3d DCA 2001) (affirming dismissal of complaint for fraud on the court based on misrepresentations in plaintiff's deposition).

Like in the above cases, Plaintiff has blatantly and without any respect for the integrity of the legal system made divergent, sworn assertions to benefit his own interest in this matter. In the criminal case against Mr. Cox for battery, which requires proof of the defendant's intent, the Plaintiff unequivocally stated under oath that Mr. Cox intentionally

attacked him. In his sworn statement to the Orange County Sheriff's office, he stated that Mr. Cox:

> ... jumped on top of me and started beating me on the side of my head. I could not see- since my glasses had fell off. They had my head in the ditch in mud and water. Harley Cox was still beating me and kicking me...

Exhibit A. The Plaintiff reaffirmed this version of the events in his deposition in the criminal case and in his response to interrogatories in the civil case against Mr. Cox for several intentional tortuous acts. See Exhibits B and D. Nowhere in any of the sworn statements did the Plaintiff indicate that he did not recall the incident or that he was guessing or speculating as to whether he was punched, kicked or grabbed. To the contrary, each of the four separate sworn statements is replete with references to plaintiff's direct recollection of Mr. Cox's battery.

However, in the instant case, after entering into a settlement agreement in which Plaintiff agreed to hold Mr. Cox harmless in exchange for an assignment of Mr. Cox's rights to coverage under Mr. Cox's homeowner's insurance policy with Liberty Mutual, the Plaintiff has completely changed his version of the events. In his deposition in this case, the Plaintiff claimed to have no personal knowledge of the events:

Q. Do you recall being struck, punched?

A. Huh?

Q. Do you recall being struck or punched?

A. Struck?

Q. U-huh

{M2026323;1}

15

A. No.

Q. What about punched?

A. No. I don't know what happened. I don't know what happened.

Exhibit H at 40.

He now alleges that in his prior sworn statements, he was expressing his opinion:

Q. And yet on several occasions you told the state attorney that Harley Cox beat the hell out of you, correct?

...

A. I was just trying to express my opinion of what I think happened.

Q. Did you tell the state attorney that what you were testifying to was opinion and speculation?

A. I told what now?

...

A. I don't remember what I told him, you know. I just – is what I felt, you know. I just – is what I felt, you know that happened to me, I don't know what happened to me. I'll be honest with you.

Id. at 52-53.

The drastic change in Plaintiff's version of the events is clearly motivated by the fact that a finding that Mr. Cox intentionally attacked him would defeat his claim for coverage under the assigned homeowner's insurance policy. See Cabezas ex rel. Ferrer v. Florida Farm Bureau Cas. Ins. Co., 830 So. 2d 156 (Fla. 4th DCA 2002); State Farm Fire & Cas. Co. v.

{M2026323;1}

16

Caldwell, 630 So. 2d 668 (Fla. 4th DCA 1994); State Auto Mut. Ins. Co. v. Scroggins, 529 So. 2d 1194 (Fla. 5th DCA 1988).

This chameleonic attempt to prevail in different proceedings based on divergent versions of the facts threatens the integrity of the judicial system and is cause for dismissal under this Court's precedence. Like in McDowell, it is not clear which of the Plaintiff's version of the events is true. However, his testimony in the criminal prosecution and the civil case against Mr. Cox are inconsistent and irreconcilable with his testimony in this case. It is evident that the Plaintiff has lied under oath and tailored his testimony to suit his self interest. This attempt to abuse the judicial system constitutes fraud on the court under McDowell. As a result, the Complaint should be dismissed under this Court's inherent power to protect the integrity of the judicial system.

## CONCLUSION

Based on the foregoing, Liberty Mutual respectfully requests that this Court grants its motion to dismiss plaintiff's complaint in its entirety with prejudice.

Respectfully submitted,

**AKERMAN SENTERFITT**
Attorneys for Defendant
One S.E. Third Ave, 28th Floor
Miami, FL 33131
Phone: (305) 374-5600
Fax: (305) 374-5095

By: _/s/ Mark Shapiro_
MARK S. SHAPIRO
Florida Bar No.: 894631
e-mail: mshapiro@akerman.com
GARY J. GUZZI
Florida Bar No.: 159440
e-mail: gguzzi@akerman.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was sent **via U.S. Mail** to: **BRANDON PETERS, ESQ.**, Morgan, Colling & Gilbert, P.A., 20 North Orange Ave., Suite 1600, Orlando, FL 32801 this _3rd_ day of November, 2003.

_/s/ Mark Shapiro_
Attorney

{M2026323;1}